**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 18-cr-00336-2 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| DESIRAY BAILEY | ) | |

## MEMORANDUM OPINION AND ORDER

After a months-long investigation, local and federal law enforcement arranged for an undercover agent to meet Tekoa Tinch and deliver sham narcotics to him. Tinch arrived at the meeting in a black Jeep Cherokee ("Jeep"), along with Defendant Desiray Bailey and her young child. After arresting Tinch, law enforcement officers interviewed Bailey and obtained her consent to search her cell phone. Officers later found evidence on that phone suggesting that Bailey had unlawfully acquired firearms for Tinch, who was a convicted felon. Bailey was subsequently charged by indictment with violating 18 U.S.C. § 922(a)(6) by knowingly making a false statement in connection with the purchase of a firearm. Specifically, the indictment alleges that Bailey represented she was buying the firearm for herself when in fact she was buying it for the benefit of a person who could not legally possess a gun. Bailey now moves to suppress the evidence found on her cell phone, arguing that the officers coerced her consent to the search in violation of the Fourth Amendment to the United States Constitution. (Dkt. No. 89.) For the reasons stated below, Bailey's motion is denied.

## BACKGROUND

In support of Bailey's motion to suppress and request for an evidentiary hearing, she submitted a sworn affidavit. (*See* Bailey Aff., Dkt. No. 90.)[1] In her affidavit, Bailey states that on

---

[1] Because Bailey elected not to testify at the evidentiary hearing on February 3, 2021, the Court did not have the opportunity to assess her demeanor while testifying or to see how her account would hold up to

May 30, 2018, Tinch drove her and her five-year-old daughter into the parking lot of a grocery store on South Pulaski Road in Chicago. (*Id.* ¶¶ 3–5.) Shortly after Tinch exited the car, armed law enforcement officers surrounded the vehicle and ordered Bailey out. (*Id.* ¶¶ 6–9.) Most relevant to the instant motion to suppress, Bailey claims that a female agent at the scene indicated that the officers would call the Department of Children and Family Services ("DCFS") concerning Bailey's daughter. (*Id.* ¶ 11.) According to the affidavit, law enforcement officers placed Bailey and her daughter into a police car. (*Id.* ¶ 12.) Bailey states that she and another agent were seated in the front of the car, while Bailey's daughter was seated with another agent in the back. (*Id.*) Bailey claims that officers asked her a number of questions and raised their voices at her when they thought she was not cooperating. (*Id.* ¶ 13.) Bailey also attests that she did not feel free to leave, yet no officer informed her of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). (Desiray Bailey Aff. ¶ 19.)

Bailey's affidavit further states that at one point during her questioning, an agent told her that she needed to think about what was more important, she and her child or Tinch. (*Id.* ¶ 14.) When officers asked Bailey to consent to a search of her cell phone, they told her that if she did not agree, they would take her phone anyway. (*Id.* ¶¶ 15–16.) Bailey's affidavit states that she understood the officers to be telling her that if she did not consent to the search of her cell phone, they would take away her phone and her child. (*Id.* ¶ 17.) Bailey further asserts that she signed a consent form agreeing to the search of her cell phone because she wanted to avoid being arrested and having her daughter turned over to DCFS. (*Id.* ¶¶ 18, 20.) After Bailey signed the consent form, the officers eventually allowed Bailey and her child to leave. (*Id.* ¶ 21.)

---

cross-examination. *See United States v. Thurman*, 889 F.3d 356, 364 (7th Cir. 2018) (affirming the district court's factual finding accepting the officers' version of events over the defendant's in part because "the court was able to assess firsthand the agents' demeanors under cross-examination, whereas it could not probe [the defendant]'s uncorroborated affidavit."). But the Court notes that Bailey's affidavit and the officers' testimony are largely consistent.

2

The Court conducted an in-person evidentiary hearing regarding Bailey's motion to suppress on February 3, 2021.[2] (Dkt. No. 145.) The Government called three witnesses to testify at the hearing: (1) Chicago Police Department ("CPD") Sergeant Scott Slechter; (2) Drug Enforcement Administration ("DEA") Special Agent Nick Albert; and (3) Bureau of Alcohol, Tobacco, and Firearms ("ATF") Special Agent Paul Daou. The Government also submitted photographs and other documents into evidence. Bailey did not testify or call witnesses. The following summary of Bailey's May 30, 2018 interactions with law enforcement is based on the testimony and evidence presented at the hearing.

CPD Sergeant Slechter testified that in May 2018, he was working on a narcotics investigation with the ATF and DEA focused on the west side of Chicago. Law enforcement officers became aware of Tinch through a confidential informant, who started cooperating with police after being arrested with a large amount of fentanyl. As a result, the CPD, ATF, and DEA had arranged for an undercover officer to meet with Tinch and attempt to sell him sham cocaine. That meeting was set to take place on May 30, 2018, at 6:00 p.m., in a CVS drugstore parking lot at 2634 South Pulaski Road in Chicago.

On May 30, 2018, at around 6:35 p.m., Tinch pulled his Jeep into the Food Market La Chiquita parking lot, across the street from the CVS. After Tinch walked to the undercover agent's car and picked up a plastic bag with a kilogram of sham cocaine, officers arrested him. Sergeant Slechter, who had been waiting nearby, arrived at the La Chiquita parking lot shortly after Tinch's arrest. Sergeant Slechter could not testify as to how many officers surrounded the Jeep or later took part in searching it, but he estimated that twenty total officers were part of the operation that day. When Sergeant Slechter approached Tinch's Jeep, he saw Bailey in the passenger seat and a young child in the back. Sergeant Slechter walked up to the passenger side

---

[2] The evidentiary hearing was delayed due to the COVID-19 pandemic.

without his gun drawn, while another officer approached on the driver's side. Sergeant Slechter spoke with Bailey briefly and directed her to get out of the car. As she was stepping out, Bailey picked up a purse from the floor of the Jeep to take with her. Bailey also took her young child, who Sergeant Slechter guessed was around six-years old, out of the car. Sergeant Slechter asked Bailey if he could search her purse and the Jeep, and she agreed. When Sergeant Slechter opened Bailey's purse, he found a large amount of cash sitting directly on the top. Bailey told Sergeant Slechter that the money at the top of the bag was not hers, but that she had $1,800 in her wallet. Officers later counted the money in Bailey's purse to total $1,271.

Sergeant Slechter arranged for Bailey and her daughter to wait in an unmarked police car while officers continued their search of the Jeep. In his testimony, Sergeant Slechter suggested that he did so because of the weather that evening, which was cold and rainy. But he also said that during his interactions with Bailey on May 30, 2018, he did not consider her free to leave because law enforcement was not sure of her involvement in Tinch's activities. After escorting Bailey and her daughter to the police car, Sergeant Slechter did not have any additional contact with them; he returned to search the Jeep. Sergeant Slechter described Bailey's demeanor throughout their exchange as respectful and cooperative. He denied ever raising his voice or mentioning the subject of child custody. Sergeant Slechter also never heard any other officer mention that subject to Bailey.

DEA Special Agent Albert was in the CVS parking lot when Tinch arrived at the scene and during Tinch's subsequent arrest. By the time Agent Albert arrived at the La Chiquita parking lot across the street, Bailey and her daughter were already seated in the back of the unmarked police car while officers searched the Jeep. ATF Special Agent Daou was also a short distance away from the parking lot conducting surveillance when law enforcement arrested Tinch. When

4

he heard by radio that Tinch had been arrested, Agent Daou drove to the La Chiquita parking lot, spoke to other officers for a few minutes to get an update, and then approached the police car where Bailey was waiting. Agent Daou estimated that he started speaking to Bailey around fifteen minutes after Tinch's arrest.

When Agents Albert and Daou approached the unmarked police car, there were two law enforcement officers near Bailey: a female ATF agent standing just outside the car and a male CPD officer sitting in the driver's seat. Agent Albert estimated that between five and ten law enforcement personnel were standing around or searching the Jeep at that time. Agents Albert and Daou both testified that Bailey and her child were seated together in the back of the unmarked car. Both agents also said that Bailey was not handcuffed. Agent Daou recalled that Bailey appeared to be using her cell phone while she was sitting in the police car. However, Agents Albert and Daou testified that that they did not believe Bailey would have been free to leave at that time.

Agent Daou said that when he first approached Bailey, he and Agent Albert stood outside the unmarked car speaking to her with the door of the car held open. Agent Daou asked Bailey for basic background information, such as her name, date of birth, her relationship to Tinch, and where she was employed. Bailey gave her name and other basic information. Agent Albert also recalled Bailey telling him that she was a nurse at a nursing home and that she had never been in trouble before. The agents both said that Bailey told them she and Tinch had been on their way to get dinner at The Cheesecake Factory in downtown Chicago that night, but that Tinch said he needed to stop at the grocery store for something on the way. Both agents also testified that they did not find Bailey's story credible and felt that she was withholding information. Agent Albert informed Bailey that Tinch, not she, was the focus of their investigation. Agent Albert advised

Bailey that she should answer as honestly as possible and that if she was covering for her boyfriend, she was not acting in the best interests of her child or her job.

Agent Albert acknowledged that at some point over the course of his interactions with Bailey, he discussed the issue of DCFS with another officer. Specifically, he and the female ATF agent standing nearby talked about whether they had a duty to report to DCFS that Tinch had shown up at a planned drug deal with a minor child. Agent Albert did not recall how long that conversation was or how many separate times he and the other agent mentioned DCFS. He described the conversation as disjointed, explaining that it took place in pieces because officers kept interrupting to provide updates. But Agent Albert estimated that for most of the conversation, he and the other agent spoke about DCFS within five to ten feet of the police car where Bailey was sitting with her door open. As a result, he believed that Bailey overheard at least some of their conversation. Agent Albert recalled that Bailey asked him whether she would be arrested. Agent Albert told her that at that point, he did not see any reason why she would be. Bailey also asked Agent Albert if she would lose her child. At different points in his testimony, Agent Albert testified that he answered Bailey's question by saying "I don't see a reason why that would happen" or "I don't believe so."

Unlike Agent Albert, Agent Daou denied bringing up the subject of DCFS or child custody during his interactions with Bailey. Agent Daou did not recall any other officer mentioning the subject either. But Agent Albert also said that he was fairly certain Agent Daou was not present for the comments about DCFS. According to Agent Albert, Agent Daou was receiving regular phone calls throughout their interview with Bailey. As a result, Agent Daou stepped away from the conversation on numerous occasions.

At some point while Bailey and her daughter were waiting in the unmarked police car, officers searching Tinch's Jeep found firearms in the trunk. (*See* Gov't Hr'g Exs. Glocks 1, 2, 3, 4, 5.) When Agent Daou asked Bailey about the firearms, Bailey said that she did not know why they were there. Bailey told Agents Daou and Albert that she owned two firearms, but that they were at her home. Based on the information Bailey provided about her own guns, Agent Albert concluded that they were the same ones officers had just recovered from the Jeep.

During his questioning of Bailey, Agent Daou asked if she had any contact information for Tinch she could share. Bailey produced a contact screen on her iPhone for an individual listed as "T." Daou took a photograph of Bailey's contact screen displaying that phone number, which the Government submitted into evidence. (*See* Gov't Hr'g Ex. Bailey Phone.)[3] In that photograph, Bailey's iPhone displays the time as 7:15 p.m. (*See id.*) Agent Daou then asked Bailey to consent to a full search of her cell phone. Agent Albert testified that he and Agent Daou hoped searching Bailey's cell phone would provide additional contact information for Tinch and possibly reveal correspondence about the firearms found in the Jeep. Both agents testified that when they asked to search Bailey's cell phone, she asked questions and expressed concerns about whether she would be without her phone for a long period of time. Agent Daou told Bailey that if she did not consent

---

[3] The Government also offered into evidence a copy of notes that it claims Agent Daou took on his cell phone during his conversation with Bailey on May 30, 2018. (*See* Gov't Hr'g Ex. Daou Notes.) Bailey objected to the admission of Daou's notes as hearsay. *See* Fed. R. Evid. 801, 802. Generally, the Federal Rules of Evidence do not apply strictly to suppression hearings. *United States v. Watson*, 87 F.3d 927, 930 (7th Cir. 1996). Nonetheless, the Court took Bailey's objection under advisement and allowed the Government's questioning concerning the exhibit to proceed on a provisional basis. Daou's notes generally recount what Bailey told officers about her and Tinch's plans for that night and about her firearms. At the hearing, the Government argued that Daou's notes were relevant to establish that Bailey had gone through the legal process of purchasing firearms. As a result of that process, the Government contends, Bailey was more likely to understand the legal gravity of consenting to a search. The Court expressed its skepticism of the Government's argument at the hearing and still considers Daou's notes as having minimal relevance, if any, to the present inquiry. That Bailey weeks earlier submitted a legal form regarding her firearms purchase does not tend to show one way or the other whether on May 30, 2018 officers used threats to coerce her into consenting to a search. As a result, the Court will not rely on the exhibit containing Daou's contemporaneous notes. Bailey's objection is sustained.

to the search, he would seize the phone temporarily to apply for a search warrant, which would leave her without her phone for a couple of days. Alternatively, Agents Daou and Albert told Bailey that if she consented, they could copy her cell phone's data that evening and return the phone within a few hours. Agent Albert offered to return Bailey's cell phone personally later that night.

Bailey eventually consented to law enforcement's search of her cell phone. As a result, Special Agent Daou presented Bailey with an ATF consent form to sign. The Government offered the signed consent form into evidence. (*See* Gov't Hr'g Ex. Bailey Consent Form.) The document is titled "Consent to Search" and contains six short statements separated into paragraphs. The first sentence reads "I understand that I have a right to refuse to give my consent to a search and may demand that a search warrant be obtained prior to any search of the person or property described below." (*Id.*) The form also states that the signer understands that any information found during the search can be used against her in a court of law; that she can consult with an attorney before giving consent; that she can withdraw her consent; and that she is giving her consent voluntarily. (*Id.*) Finally, the list concludes "I have read the above statement of rights, understand these rights, and hereby authorize agents of the [ATF] to conduct a complete search of the property described below." (*Id.*) Under the description section, there is handwriting that reads "Apple iPhone, IMEF 355318089656323." (*Id.*) Agent Daou recognized that handwriting as his own.

Agent Daou testified that he read all the statements on the consent form out loud to Bailey, holding the consent form so that Bailey could read along if she wanted to. Agents Daou and Albert both represented that Bailey did not object to or ask questions about any of the statements on the consent form. Bailey's signed initials (DB) appear next to all six statements. (*Id.*) Both agents said that they witnessed Bailey initial each of the statements on the consent form and sign

the form, and that they both signed it as well. Bailey's, Agent Daou's, and Agent Albert's signatures are all found at the bottom of the form, dated May 30, 2018. (*Id.*)

Sometime after Bailey signed the consent form, Agent Albert gave her phone back briefly so that she could call a friend or family member to retrieve her and her daughter from the parking lot. Based on Agent Albert's subsequent review of Bailey's phone records, he believed that she made that phone call at 7:53 p.m.[4]

Overall, all three officers who testified at the hearing described Bailey's demeanor throughout their interviews as respectful and cooperative. Sergeant Slechter and Agent Daou also testified that Bailey's child never seemed upset or in distress, while Agent Albert did not recall if the child ever appeared distressed. All the officers said that prior to May 30, 2018, they were not aware of Bailey or her child as a result of their investigation into Tinch. In other words, they did not know who Bailey was when she arrived with Tinch. In fact, Agent Albert stated that even as of the date of the hearing, he did not know the relationship, if any, between Bailey's child and Tinch. And though the officers all testified that they did not consider Bailey free to leave until Agent Albert allowed her to call a friend for a ride, none of the officers informed her of her *Miranda* rights or heard another officer do so.

After Bailey consented to the search of her cell phone, law enforcement officers copied all of the cell phone's data. They later found text messages sent between Bailey and Tinch in April

---

[4] The Government submitted into evidence a document that it asserts consists of phone records for Agent Albert's work phone. (*See* Gov't Hr'g Ex. Albert Tolls.) Bailey objected to the admission of the records as not properly authenticated. *See* Fed. R. Evid. 901. The Court took Bailey's objection under advisement. Agent Albert's testimony suggested that the Government offered the phone records to show that Agent Albert called Bailey's friend sometime later in the evening on May 30 to ask when she would arrive. The records also purportedly show that Agent Albert called Bailey's friend several hours later to return her cell phone. But the steps that Agent Albert took after Bailey signed the consent form (and after he told Bailey that she was free to leave) are not relevant to the inquiry of whether her consent was voluntary. Therefore, the Court sees no reason to rely on the records.

2018. Those text messages showed Bailey in direct communication with and taking direction from Tinch while purchasing the firearms that officers found in his Jeep on May 30, 2018.

**DISCUSSION**

The Court starts from a presumption that warrantless searches are unreasonable under the Fourth Amendment. *United States v. Thurman*, 889 F.3d 356, 365 (7th Cir. 2018). A warrantless search "is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 382 (2014). One such exception is the defendant's voluntary consent to a search. *See United States v. Strache*, 202 F.3d 980, 984 (7th Cir. 2000). In this case, Bailey concedes that she initialed and signed the form consenting to the law enforcement officers' search of her phone. But she nonetheless asserts that her consent was not voluntary because the officers suggested that they would take away her daughter if she did not cooperate.

"The Fourth Amendment requires that consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Thurman*, 889 F.3d at 367 (internal quotation marks omitted). When a defendant asserts that officers coerced her into consenting to a search, "[t]he government bears the burden of showing voluntariness by a preponderance of the evidence." *United States v. Hicks*, 650 F.3d 1058, 1064 (7th Cir. 2011) (internal quotation marks omitted); *see also United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005) ("The government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given."). Whether an individual's consent was voluntary is a factual determination for the court to make. *United States v. Richards*, 741 F.3d 843, 847 (7th Cir. 2014).

Courts decide whether a defendant's consent was voluntary based on the totality of the circumstances. *Thurman*, 889 F.3d at 367. The Seventh Circuit has set forth several factors relevant to that determination: (1) the defendant's age, education, and intelligence; (2) whether

10

officers advised the defendant of her constitutional rights; (3) the length of the defendant's

detention; (4) whether the defendant consented immediately or only after repeated requests; (5)

whether officers used physical coercion; and (6) whether the defendant was in custody at the time

she consented. *Id.* In reviewing the factors, the Court considers how they could put a reasonable

inquirer (*i.e.*, the interviewing officer) on notice that the suspect was not in a position to give her

voluntary consent. *See Grap*, 403 F.3d at 445. The Court's determination as to whether a suspect

gave her consent freely and voluntarily is not dependent on a single factor but based on all the

surrounding circumstances. *Richards*, 741 F.3d at 848.

Bailey's motion to suppress focuses on her claim that officers intimidated her into

providing consent by raising the subject of child services in front of her and her young daughter.

The Seventh Circuit has recognized that "explicit threats to a suspect's custody of a young child

are presumed to be coercive." *Lentz v. Kennedy*, 967 F.3d 675, 691 (7th Cir. 2020). But "police

are ***not*** forbidden from talking about a suspect's children." *Id.* (internal quotation marks omitted).

If police do talk explicitly about the suspect's children, "any statements about a child's custody

should not be false; otherwise the suspect's will may be overborne by lies that have nothing to do

with the strength of the evidence." *Id.* (internal quotation marks omitted). Therefore, officers'

comments and actions are less likely to be found coercive when they merely provide truthful

information about child custody. *See Janusiak v. Cooper*, 937 F.3d 880, 892 (7th Cir. 2019) ("The

questioners spoke the truth when they said that ***if*** Janusiak had harmed [the victim], then she

might lose custody of her children, and that if she did no harm, she could remain with them.");

*United States v. Spates*, 777 F. App'x 826, 829 (7th Cir. 2019) (affirming the denial of a motion to

suppress because "officers' truthful statements that they were mandated to report to DCFS were

not coercive threats").[5] In particular, "[w]hen the suspect raises the matter, a police officer can avoid a later accusation of impermissible exploitation by avoiding the question with a truthful statement (*e.g.*, 'I don't know what will happen to your kids')." *Janusiak*, 937 F.3d at 891.

The Court finds that the Government has met its burden to show by a preponderance of the evidence that Bailey freely and voluntarily consented to the search of her cell phone. To begin, there is no evidence that Agent Albert or any other officer made any explicit threat regarding Bailey's custody of her daughter. *See United States v. Santiago*, 428 F.3d 699, 705 (7th Cir. 2005) (finding "the absence of any explicit finding of a threat by police" to arrest the defendant's fiancée or children indicated that his consent to a search was voluntary). Agent Albert never directly mentioned DCFS to Bailey and, according to his uncontroverted testimony, he only raised the subject in the form of a question about what his responsibilities were. He also never mentioned the child's custody in the context of asking Bailey to cooperate or to consent to a search, nor did he promise leniency or condition custody on her consent to a search. *See Lynumn v. Illinois*, 372 U.S. 528, 532–34 (1963) (setting aside judgment and remanding for further proceedings where the defendant confessed after police threatened to cut off state aid to her infant children but promised leniency if she cooperated). Overall, Agent Albert's conduct is far from the explicit threat concerning custody that courts have deemed coercive. *See, e.g.*, *United States v. Ivy*, 165 F.3d 397, 402–04 (6th Cir. 1998) (reversing the denial of a motion to suppress where police handcuffed the defendant's girlfriend, took away her baby, and threatened to take the baby into protective custody unless he cooperated). Agent Albert also responded to Bailey's fears about being separated from her child by telling her that at that time, he saw no reason for her to be arrested or lose custody. That noncommittal statement might not have quelled Bailey's anxiety, but it is the

---

[5] *Spates* is an unpublished Seventh Circuit order issued after January 1, 2007. Although not precedential, the order's reasoning is persuasive and the facts provide a useful point of comparison here. *See* Fed. R. App. P. 32.1(a); 7th Cir. R. 32.1(b).

kind of truthful statement that the Seventh Circuit has found to weigh against a finding of coercion. *See Janusiak*, 937 F.3d at 892 (finding it acceptable for the officer to tell the suspect that she might lose custody of her children if she had committed a crime).

Further, Agent Albert suggested that Bailey should consider her and her child's best interests before the subject of Bailey's cell phone came up and then only to suggest that she tell the officers the truth. The Seventh Circuit has found officers' nudges not to be coercive when they simply encourage suspects to think of their families or to act in their families' best interests. *See Lentz*, 967 F.3d at 692 (holding that the officers' pleading with the suspect to tell the truth by asking her to think about her daughter fell "squarely within bounds of permissible familial commentary"); *Santiago*, 428 F.3d at 705 (agreeing that it was permissible for law enforcement to obtain a suspect's consent by making him consider the possible consequences to his family). Bailey may well have agreed to the search of her phone partially out of concern for her daughter, but that fact alone is not sufficient to make her consent involuntary. *See Santiago*, 428 F.3d at 705 (affirming the district court's judgment that the defendant's "'rightful concern' for his family did not amount to 'psychological pressure'").

The Court is also skeptical of Bailey's claim in her affidavit that when officers threatened to take away her cell phone, she believed they were implying that they would also take her child. The testimony supports that Bailey pushed back on the officers' request for her consent by telling them that she was not willing to part with her cell phone for a long period of time. Agents Albert and Daou both recalled Bailey asking several questions about how long she would be without her cell phone. As a result of Bailey's concerns, the officers agreed to give her cell phone back later that night.[6] But Bailey did not ask officers to confirm that if she consented, she could maintain

---

[6] Although officers told Bailey that they would confiscate her cell phone regardless of whether she consented and apply for a search warrant, it is unclear whether the facts and circumstances would have

custody over her daughter. That Bailey objected to the officers' request on other, less serious grounds suggests that she did not actually believe the custody of her daughter depended on her consent.

While the circumstances described above ultimately lead this Court to conclude that Bailey's consent was voluntary and her motion should be denied, certain factors do raise questions about the officers' conduct. First, the record indicates that Bailey was in custody during her interactions with law enforcement. "In determining whether a person is in custody, our first step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave." *United States v. Borostowski*, 775 F.3d 851, 859 (7th Cir. 2014). Factors courts may consider include "the location of the questioning, its duration, statements made during the interrogation, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning." *Id.* at 859–60.

Here, all of the officers who testified agreed that Bailey was not free to leave during their interviews with her, which, in turn, lends credence to her claim that she did not feel free to leave. Bailey was not placed in handcuffs at any point and, according to Agent Daou, she was permitted to use her phone. But Bailey had been escorted to the back of a police vehicle and was sitting with and surrounded by numerous officers. *See id.* at 861 (finding the fact that the officers accompanied the defendant as he moved through his home indicated that he was in custody). Sergeant Slechter implied that he placed Bailey in a police vehicle because of the cold, rainy

---

supported the issuance of such a warrant. "A baseless threat to obtain a search warrant may render consent to search involuntary." *Hicks*, 650 F.3d at 1064 (internal quotation marks omitted). But "when the officer's expressed intention to obtain a warrant is genuine, and not merely a pretext to induce submission, it does not vitiate consent to search." *Id.* (internal quotation marks and alterations omitted). The Court finds that Agents Albert and Daou had at least a good faith basis to believe they could have secured a search warrant for Bailey's cell phone.

weather, and the Government emphasizes that the car door where she was seated was open throughout her detention. However, officers were standing in front of the opening, blocking her exit. Furthermore, the officers kept Bailey there for more than an hour.[7] Based on Bailey's location in a police car, her restricted movement, the length of her detention, and the officers' testimony that she was not free to leave, the Court believes that Bailey was in custody during her May 30, 2018 interview with law enforcement.

Although Bailey was in custody, she did not receive fulsome *Miranda* warnings. The consent form that Agent Daou showed and read to Bailey informed her of some—but not all—of her rights. However, that Bailey was subjected to a custodial interview without receiving *Miranda* warnings is not enough to indicate that her consent was involuntary. *United States v. Renken*, 474 F.3d 984, 987–88 (7th Cir. 2007). There is no evidence that officers at the scene exercised force against Bailey. And despite the claim in Bailey's affidavit that officers raised their voices at her, all the officers who testified denied that they ever did so. *See United States v. Ruiz*, 785 F.3d 1134, 1147 (7th Cir. 2015) (affirming the lower court's finding that the defendant's consent was voluntary in part because officers spoke to him in a calm, conversational manner).

With respect to Bailey's claim that officers implied they would take custody of her child if she did not cooperate, the evidence establishes that certain officers explicitly mentioned DCFS in

---

[7] Sergeant Slechter estimated that Tinch arrived at the La Chiquita parking lot at 6:35 p.m. Based on the officers' testimony, law enforcement arrested Tinch and approached the Jeep within only a few minutes. Very shortly thereafter, officers ordered Bailey to exit the vehicle. The photograph that Agent Daou took of Bailey's phone shows that he was still interviewing her at 7:15 p.m. Agent Albert finally allowed Bailey to call for a ride at 7:53 p.m. From these facts, the Court concludes that officers detained Bailey for more than an hour, suggesting that she was in custody. *Compare United States v. Clark*, 798 F. App'x 5, 8 (7th Cir. 2020)[7] (affirming the finding that an interrogation lasting well under an hour was not custodial in nature), *and United States v. Ramos-Guerrero*, 145 F. Supp. 3d 753, 762 (N.D. Ill. 2015) (finding that the defendant was not in custody during a fifteen-minute conversation with two agents), *with Borostowski*, 775 F.3d at 862 (disagreeing with the lower court's ruling finding that the defendant was not in custody when he was subjected to an hours-long interview), *and United States v. Khomutov*, Nos. 18 CR 00400-1, 18 CR 00400-2, 2020 WL 1304834, at *8–11 (N.D. Ill. Mar. 19, 2020) (concluding that an interview was custodial where officers questioned the suspect for almost an hour and never informed her of her right to leave or end the conversation).

her presence. Moreover, the evidence indicates that the officers were the first ones to bring up the issue; they did not merely respond to Bailey's concerns about her child's safety or custody. *See Janusiak*, 937 F.3d at 891. Agent Albert testified that he and the female agent discussed DCFS within five to ten feet of the car where Bailey was sitting with the door open—the officers did not lower their voices or attempt to keep private what they were talking about. Agent Albert testified that he mentioned DCFS because he believed he might have had a legal obligation as a mandatory reporter. But Agent Albert did not ask any follow-up questions about Bailey's daughter nor could he recall whether the child became upset during the interview, suggesting that he was not paying particular attention to her. In addition, Agent Albert's references to DCFS ceased once Bailey signed the consent form. Shortly after that point, Bailey was permitted to use her cell phone to call for a ride and leave.

In the end, despite some indications that the law enforcement officers who obtained Bailey's consent to search her phone might have been using the specter of DCFS involvement to encourage her cooperation, the Court concludes based on the totality of the circumstances that Bailey's consent was freely and voluntarily given. As discussed above, the officers' conduct did not amount to threats or coercion (either explicit or implicit), did not include any lies or false promises, and otherwise fell well within the bounds of investigative techniques permitted consistent with the Fourth Amendment.

**CONCLUSION**

Accordingly, for the reasons provided above, her motion to suppress (Dkt. No. 89) is denied.

ENTERED:

Dated:  July 23, 2021

_____
Andrea R. Wood
United States District Judge

17